Yes, Your Honor. Good morning, and may it please the Court, Aaron Street for Montana-Dakota Utilities Company for the first seven minutes. The commission erred in two ways. First, it misinterpreted the agreement to allow costly market-to-market coordination, even though that coordination could not possibly relieve the congestion that was locally caused by the Atlas Data Center. Second, and even if coordination was proper, FERC unlawfully allowed MDU to be double-charged for the same congestion on the same load. I hope to address both of those issues in my time this morning, and then my friend from MISO will further address the interpretation of the agreement and possibly other issues as well. Now, turning to the agreement, in holding that FERC, that Section 8.1.1's regional not local requirement was not binding, FERC fundamentally misunderstood the different but binding functions that Section 1.1 and Section 8.1.1 play in the agreement. Section 1.1 identifies flowgates that are eligible to potentially be used in market-to-market coordination. Section 8.1.1 identifies a subset of those flowgates that will actually be used in market-to-market coordination and result in a financial settlement between the parties. Why is FERC wrong in interpreting 8.1.1 as prefatory? Yes, because it ignores the structure of the agreement. If the parties wanted this to be a prefatory clause, there were prefaces in the agreement, there are prefaces within Section 8, but instead they chose to place the regional not local requirement. Why are they wrong just from the language of 8.1.1? I agree. If all you had was the text of 8.1.1, it would be a closer case. But you have to read that in light of the fact that it's within Section 8, which is entitled appropriate use of the market-to-market process. You read it in light of the fact that Section 8 also tells us that it aims to identify a subset of the 1.1 flowgates that will actually be used in the process and result in a financial settlement for the parties. And you read the regional not local test in light of the fact that Section 8.1 itself is entitled qualifying conditions for market-to-market settlement. Again, not just selection of the flowgates, but which ones are actually going to result in a financial settlement from the parties because they can actually be used to relieve congestion. But that just, I mean, to get to Judge Smith's point, there's other things in Section 8 that seem to be binding, that seem to be conditions of the settlement, whereas it seems like 8.1.1 is just a preview. It says this is the purpose of everything that is to follow. Why is that sort of not a valid reading of that particular provision? Well, I won't reiterate all of the structural points that I think indicate that. I think Section 8.1.1 is consistent with everything that comes after in that they are both aiming to identify which flowgates actually get used and settled on. And I think, again, you don't just look at the text of 8.1.1, although that's important. You would look at it in context with the subset language. But just looking at 8.1.1 itself, if the parties wanted this just to be a preface or an introduction, why would they have placed it under the qualifying conditions language? And then when you look at it in light of the overall purpose of this agreement, which is obviously to actually relieve congestion, and the regional versus local test goes to that, if this is a local problem, which almost nobody really disputes that it is, this power center came online, there's constrained transmission going in, and MISO can't re-dispatch anything locally that would meaningfully relieve it. You can use a general word like local and pour into it anything you want. Why is a reviewing court supposed to get into this kind of contract interpretation issue? De novo regulatory agency. What's the factually most comparable Supreme Court decision in your view on that question? Factually comparable? I'm not sure, Your Honor. We are now in a new- I don't think so. I mean, I've done a lot of them over the years, and this is not a lot of PERT cases, but a lot of regulatory cases, including energy and oil and gas. And this is, well, it reminds me of the Federal Power Commission area rate cases, which got cured by deregulation. Right. And if you were in the pre-Loper-Bright world, I would 100% agree with you, Your Honor, but after Loper-Bright, questions of contract interpretation are de novo. Even if it's tough, this court has to give it the best reading. And I think you can also look at the fact that, as MISO points out in its brief, pages 45 to 47, the parties discussed adopting a definition of the term local. They wouldn't have done that if that weren't a binding- What appellate decision so far has interpreted a Loper-Bright on that specific point the way you urge? I mean, you just asserted this. This is the law. Okay. I will say the best case to read, probably, that directly addresses it is Judge Rao's separate opinion in NextEra. It's not the majority opinion. Majority doesn't reach the question, but she persuasively explains why tariffs and contracts are questions of law that get de novo review after Loper-Bright. And if I could, I want to turn to the double-charging issue because even if the market-to-market coordination were proper, it's never proper to charge a party twice for the same service. And FERC doesn't dispute if we were actually charged twice for the congestion charges on this load, that that would be a violation of the unjust and unreasonable requirement. All they argue is that we didn't adequately prove it because MISO and SPP commingle all of their congestion charges. They don't give you a line-item invoice that says congestion on the Williston load. But FERC didn't look at the evidence that we actually put on where our expert witness, Mr. Negum, explained that the congestion charges from both MISO and SPP spiked almost in equal numbers right at the time the Atlas Data Center load came online. And he explained that this was not from congestion on other parts of the MDU MISO load. It was from, because the prices didn't spike in that area, it was from this particular area. And what's our review standard for the FERC's decision on the double counting or double charging? I think that's arbitrary and capricious, Your Honor, and substantial evidence. And because FERC didn't address the evidence that we put on, it just said it's hard to prove this because the dollars are commingled. They didn't actually address whether our evidence measured up to any standard. So they acted arbitrarily and capriciously. With that, I'll hand it over to my colleague. Just out of curiosity, maybe it's more than curiosity, if your client was double charged, who pays the bill? Is it the customers or your shareholders? It's our customers. We would recover that from our customers. And that's why this is ultimately an injustice against our customers that FERC is going to have to sort out who refunds us the money, which we would then flow back to our customers. Thank you, Your Honor. Good morning, Your Honors. Jay, please, the court. McKeelan? McKeelan. Brian McKeelan for MISO. Mr. Street was addressing Section 8.1.1. I want to touch on just a couple points there. First to Your Honor's question about local and how that term may be less than clear. FERC did not, and it also goes to the standard review, FERC did not do what we wanted them to do, which was to get into the question of was this local or regional. It decided as a pure matter of law that that was not a condition at all and not something it had to engage with. Therefore, we submit that this is a de novo review because they did not get into anything that would constitute agency discretion or invoke their expertise. This was just a question of law. Although that still gets back to the question that Judge Smith and I both asked about earlier, which is how do we know it's binding? When I see this, when I see an introductory that says purpose of market to market and then says this was established to do something, that looks like it's aspirational to me. It does not look like it's, and if you compare it to the rest of 8.1, those look like conditions, like actual requirements. So I think two points there, Your Honor, in addition to the structural items that Mr. Street addressed. First is when you're talking about this aspirational and I think all of the cases that FERC cites, you're dealing with a situation where there's a general statement of some kind followed by specific provisions that implement that. You don't have that here. There's one provision in this agreement that addresses the regional not local issue and it's this one. It says was established to address these issues, period. There's nothing else for that language to give color to. That's the sum and substance of it. So yes, it's obviously expressing an intent, but it's also establishing a qualifying condition. And further to that, I think a really important issue here- But doesn't 8.1.2 speak more specifically to conditions? Yes, but conditions other than local versus regional. So that's- And you're saying that's where the big flaw is in FERC's reasoning? Exactly. This is the only thing we have that talks about local versus regional. And why is that important? And that's where I wanted to get to also. This agreement doesn't work for local. It doesn't work. As Mr. Street said, MISO could not alleviate this congestion. That's the point of market to market and the settlement payments is, hey, let's manage this congestion. We couldn't do it. And there's really no evidence to the contrary there. Because I think the testimony in the record from MISO where they said this is local and actually MISO not being able to relieve the congestion is precisely what makes the issue local as opposed to regional. How do you frame this though? And I'm not a FERC expert, but local could mean a neighborhood, a town, a metro area. It could mean a region within a state. It could mean a region within the country. I have no idea what regional versus local means. Just from this. Just from this. And your Honor- And what I was going to ask is, is the source of it what the parties put in an agreement? Or is the source of it local and actually drawn from FERC law? So- It looks to me like it's just what you decided in the agreement was the way to express the intent. Right. I think, again, what comes to us, and we're not asking the court to decide what is local. If that's true, then you're bringing a contractual, you're not bringing an established question to FERC. You're bringing a term that you made up that seemed right for the circumstance. That's important to me, I think. Sure. No. And your Honor, I said, and I understand, and I think that term has real meaning in the industry. And that's why our expert addressed the issue. What is local? And he said, what is local? A key determinant as to what is local is can the non-monitoring RTO, which is MISO in this situation, can they effectively relieve the congestion? If not, it means that this process doesn't work. What's supposed to happen is these flow gates get congested, then MISO is supposed to turn up other generation, either nearby, locally, or from other sources, through other transmission facilities. And it couldn't do that. And there's no real question here that they couldn't. You know why? Because no one here has said, hey, MISO, you blew it. You should have done something different. You should have turned up this generation. You should have done this. There's no accusation of that. No accusation that MISO didn't fulfill its obligations under the agreement. Is it at the flow gate level or is it SPP versus MISO level? Like in other words, like what do we look – because there's all these flow gates, my understanding, all over that border between the two companies or the two regions. And so I'm trying to figure out, is it several of them? Is it one? Is it the whole thing? Isn't the focus on the Charlie Creek? The focus is the Charlie Creek, exactly. This is just about the Charlie Creek and that MISO was unable to manage the congestion on that flow gate. On the other flow gates, it could. Here it could not. All that happened were we were saddled with these payments with no ability to relieve the congestion. That's why it doesn't make sense to have MISO pay roughly $40 million and its members have to ultimately contribute that and their customers in order to manage a system that can't be – or manage congestion that can't be managed. So local is per flow gate then in your view?  Okay. Yes. And so just wanted to address another issue and that is going forward. We have this situation we talked about where we're being saddled with these payments that MISO had no ability to relieve and that doesn't make sense and that's why regional not local is a critical condition. But also FERC looked at this and said there was no need to fix this going forward. And that's where MISO also contends that FERC erred. And the first point there is that there was a section, the parties recognized that there might be a situation where the flow gate technically qualifies as a market-to-market flow gate but it's not well-suited, the process isn't well-suited for that. So they created a safety valve, section 1.3.4. And MISO went to SPP here and said, look, we can't do anything with this. We should take this out of the market-to-market process. But SPP refused. And FERC found that SPP had an unrestrained veto power over removal of the flow gates and that left MISO with no option. I don't think they called it that. What's that? I don't think they called it a veto power. They may have, but they said that it was certainly up, they had discretion to say no. That's your, you know, good debating way to put a bad spin on what the agency tried to say. Yes, I certainly view it as a veto power that we think this should be removed and SPC said we don't. And FERC said that's fine. That's entirely up to SPP if it decides it wants to do that. Well, because they had a good reason. And what was that, Your Honor? I thought SPP carefully explained the reason for its action. Well, and there, Your Honor, I think that gets into this question. A lot of what they point to, it all comes back to those initial tests. Were the initial tests about whether there's... Can we read this as a categorical veto? When SPP explains what it did and you explain why you think that should not be permitted and FERC doesn't agree with, you know, says you didn't prove enough to disprove their explanation, their reason for doing it. And, Your Honor, I don't think FERC truly engaged with our side of that question because... Yeah, because you didn't win. But I also think that... We hear that at every agency appeal. Right. But I think the question is you have now going forward a situation where there is no out if the other party doesn't agree. And Your Honor says you believe that SPP may have had a good reason here. But I don't believe that's what FERC ultimately held. I think they held they have... Without their agreement, whether there is a good reason or not, then there is no relief to MISO here. Is that contractual or is that regulatory? And the reason why... What I'm trying to get at is you talked about like utility practice and other things. So I'm trying to figure out if FERC relied on that as a contractual matter where we'd be potentially de novo review or arbitrary and capricious. This I would say it is under arbitrary and capricious because we're saying that the tariff, if they're going to interpret that way, needs to be changed. And then the question is did they fail to engage with the evidence properly? Did they not do the adequate consideration of the evidence before? And we believe that was failed in this instance, Your Honor.  So I will leave the rest of the time for my colleague on rebuttal. Thank you, Your Honors. Thank you. Mr. Shaner. Good morning, Your Honors. May it please the Court. Houston Shaner for the Federal Energy Regulatory Commission. I'd like to start off on the core issue of the tariff debate, namely Section 8.1.1. I think the panel understands this issue very well, so I don't want to belabor it too much. But at the highest level, I think the decision comes down to this. Are these contractual protections that were very specific in Section 1.1 where they meant to solve disputes before they begin with clear technical inputs that give clear, predictable results? Or were they meant to be an invitation to constant litigation over hundreds of flow gates every month along thousands of miles of borders along the seam? I think that the panel understands that the counter-interpretation offered by MISO and NDU ends up in the latter. Every time load changes anywhere near the seam, any arbitrarily defined distance near the seam, one party can come back and say, well, it's no longer a regional matter. It's now a local matter. The term local is not defined in the joint operating agreement. And even for some of the terms within 8.1.1, particularly significant impact, not even the parties on the other side of the V can agree on what they mean. MISO, for example, indicated that the flow gate studies do satisfy the significant impact test in the last sentence of 8.1.1, but NDU does not make that same assertion. We're going to have that same problem over and over again. So the only people who would benefit from their reading of 8.1.1 are the litigators. That's great, but it's not what contractual protections are meant to do, just as the Arimony Court said and as this Court effectively did in Olander. Well, opposing counsel says what it's really about is, at least in setting that sub, is it's about can you do it at a particular flow gate. You heard them say local is a particular flow gate which is definable, and here there was no way to reduce the congestion or accommodate the congestion through that single flow gate. And so, therefore, it created a local problem that really was not supposed to be addressed by the agreement. I think there are two responses to that, Judge Strass. First is that, just as a factual matter, the effectiveness relief is sort of a different question on different issues, and I can get to that. That's sort of a factual debate reviewed under substantial evidence. That question is not in the text, really, of 8.1.1 or 1.1. What defines the practical redispatch options as recognized in JA 830 to 831, and I believe also at JA 860, are the flow gate studies and the 5% threshold there. And those studies have found, I believe it's JA 859, that MISO has multiple generators who can dispatch into the Charlie Creek flow gate here at a significant impact level to provide relief. Now, the second response on that sort of issue is that this idea of effective relief is getting us even farther from the text of 8.1.1, and the key there is to look at the verbs. 8.1.1 is a purpose clause just like that in Eremone. It does not use mandatory language. It uses descriptive language as described by Sprint and Excel. It is not forward-looking promissory language. And really the debate ends and begins there. Now, there's never been any dispute that 1.1, namely the flow gate studies, are what creates eligibility for market-to-market coordination. And as this panel has recognized, Section 8 itself has many, many other highly detailed, highly technical provisions to winnow down market-to-market coordination in terms of appropriate use and to satisfy all the headers that they talked about. But 8.1.1 is not among those. It's clearly a purpose clause like in Eremone or analogously like in Sprint and Excel, the nature of service clause. Does the structure here play a role? And the reason why I say that is this is at the very beginning of a section dealing with conditions. Had this particular provision been in the middle between two very specific conditions, would FERC have a different view of it, the contractual issue? I don't think so, Your Honor, and that's because the text of the provision itself is descriptive, not promissory. And as the authorities provided reading law, for example, or Sprint and Excel from the Fourth Circuit indicate, the location doesn't matter. Now, in this case, I think the location is actually in our favor because it's sort of a nested preface, if you will. It is preparatory to the other five conditions under 8.1, which are highly detailed, and I think anyone disputes are operative terms in this case. But there are multiple, as my colleagues mentioned, there are multiple prefaces in this document, for example. There's a preface to Section 8 itself and a preface to the interregional coordination process on its own. On that latter note, if you look at that first preface, you'll note the first line in the preface is, the purpose is, just like the purpose clause. So 8.1.1 is meant to clarify the later conditions. So how does a nested preface work? Well, I think what I mean by that, Your Honor, is that it's placed at the top of Section 8.1 because there are, I believe, five other sections, 8.1.2 through 8.1.6, and that's JA 1260 through, I think, about JA 1262, that have detailed operative provisions that define the appropriate use and the qualifying conditions under which market-to-market management and settlement can occur. But if you look at 8.1, particularly the text, it's not among those. And even beyond the text, I would invite the panel just to simply look at the purpose clause visually on the page and the layout on JA 1260. I mean, Section 8 of the ICP and the rest of the ICP, the tariff, is a very, very long document. They have lots of fertile ground to find other claims there. And if the best they can do is to find the most plastic language and the most abbreviated statement of a high-level purpose, I mean, I think that's ultimately telling about the merit of the claim and the fact that the ICP and the tariff were followed here. What is the function, do you think, and I'm not saying it's a purpose provision. That's at sort of a global scale. What is the purpose? You heard opposing counsel say that this is unlike anything else in Section 8. It doesn't really talk about any of the specific conditions that follow. And so it sort of sits out there on its own a little bit. What do you think it's saying? What does FERC think this particular provision is accomplishing or what it's saying? As the Commission noted in paragraphs 40 and 43 of the hearing order, it is a generalized statement of purpose. And to the extent there's any ambiguity in the later sections of the operative provisions of Section 8, primarily Section 8.1, those other five conditions I talked about, it can be used to clarify ambiguity in that. And that's from reading law. That's from air money. It's for Nextel. It's not that a purpose clause does no work in a contract, but it simply does not create binding legal consequences. Even if it's true and maybe you disagree with this characterization as if it's kind of sitting out there on its own or it feels like it's sitting out there on its own because what follows doesn't necessarily relate to that purpose clause directly. I wouldn't necessarily agree that it doesn't relate to the purpose clause directly. The difficulty here is that the other five sections in 8.1 weren't litigated at all. They didn't raise any claims under them. So we can't – it's harder to identify ambiguity as applied to a particular record. But here we all – there's no dispute that Section 1.1 put this foil gate into market-to-market coordination. So they need to find a detailed operative – a clear operative provision in Section 8 to take that out of market-to-market coordination. And the best they can do is this – the intent is was established purpose clause, which is a direct analog to the Second Circuit's decision in Eremone, which like this case had a sort of a freestanding purpose clause as well. And I should also note that we call it prefatory. That's a shorthand label. But as this Court said in Olander Auditory, you could also say precatory. There are lots of words for this. I don't want prefatory to give the implication or the suggestion that it needs to be in a preface because that's not what the authorities say. Now, if I could move quickly to the duplicative congestion charges issue. I guess I should also ask if there are any other questions on tariff at this moment. Oh, sorry, one other point on the tariff. I think it's possible this Court – I think it's likely this Court does not need to get to the deference question. In this case, I think the text is quite clear. The Commission said that we wanted the text. But even if there's some ambiguity in the text, we still have the extrinsic evidence of four years and hundreds of flowgates, all of which were used and designated for market-to-market coordination entirely on the basis of the flowgate studies used here. That is as strong as course-of-performance evidence as we will ever get. And that is an alternative holding in paragraph 47 of the rehearing order. And you would only need to reach the deference question, the standard review really, after that case because I think we win even under MDU's interpretation of Loeferbright, which, of course, we do not fully agree with that. On the duplicative congestion charges issues, I think the central point here is that duplicative congestion charges imply duplicative congestion relief. And that really is a central premise that has been ignored by my friends on the other side. At the highest level, what happened here is that MDU saw that American Electric Power had success in a complaint proceeding about duplicative charges in 2019 to 2021, brought a Section 206 claim against MISO and SPP. The Commission found that, yes, there was some small potential for overlapping congestion charges in the American Electric Power order recounted in that paragraph from 2021, or the AEP complaint order as described in the orders under review here. But then the Commission created a remedy, or the RTOs created a remedy that the Commission approved called the predictive flow factor process. And that is in Section 3.4 of the Interregional Coordination Process, or the tariff here. And there is not one word from Topside Council about this whatsoever. And that is for a reason. That's because not only do they not dispute that it solves the problem here, they cannot dispute that because in the hearing stage below, Montana, Dakota did not contest the Commission's finding in the complaint order that that process solves this problem of overlapping duplicative relief. And when I say duplicative relief, I mean that, say you need 10 megawatts of relief. MISO might redispatch 5 megawatts. SPP redispatches 5 megawatts, whatever it might be. As long as that adds up to the total, that's fine. And there was some overlap in the first intervals of redispatch, as recounted in the AEP complaint order and in Southwest Power Pool 2021 order in the red briefs. But that problem has been solved. There's no real dispute on the record that that was applied here. SPP submitted evidence. SPP was the monitoring RTO, so they directed the amount of relief requested, and that's at JA 1232 to 1234. That has been followed by MISO as recognized, I believe, in complaint order paragraph 117. There's no real response to that, so the remedy has been applied for duplicative congestion charges. So whatever label they put that under, cost causation, just and reasonable, whatever, the facts here are that the correct process was followed. Now, the review standard that we have for the cost causation issue, is that abuse of discretion? It would be under arbitrary and capricious. Yes, Your Honor, I believe so. But on that point, I believe Judge Loken did point out an important part of the arbitrary and capricious standard as applied to the Federal Power Act. When we get into these questions of rate design or competing policy trade-offs, cases like Permian Basin area rate cases going back to the 1960s, say that FERC gets, or then the Federal Power Commission, gets great deference on its weighing of competing policy objections and trade-offs. Now, it might be unfortunate, but there's some zero-sumness here created by the tariff. Someone has to pay a cost when there are higher prices, but the Commission equitably reconciled those under its judgment under the Federal Power Act, and requires a very, very high bar to overcome that. On duplicative congestion charges, I also just did want to address my friend's claim in the briefs about confusion. They sort of have this idea of three buckets. Now, I think all you need to do on this claim, one, it's not responsive to the break-to-flow factor process, so you don't really need to get to it. But if you just go to a rehearing order, paragraph 57, you will see the Commission lay out all three buckets. Bucket number one is charges under SPP's tariff for using SPP's system. That's the third sentence in that paragraph. Bucket number two, charges under the MISO tariff for using the MISO paragraph. That's parentheses two in the following language in the first sentence, to reimburse costs to MISO. And then again, in the dependent clause beginning while NDU makes, leading to call number 171. And then bucket three are the market-to-market charges paid between MISO and SPP, not directly by NDU. And that is the fourth sentence beginning by contrast. And that's all the Commission needed to say about this. And in the prior American Electric Power Proceedings, the Commission already found that separate charges, separate charges under separate tariffs for using separate lines, are perfectly permissible because you're creating congestion or contributing congestion on both sides of that seam. Now, I think the core, sort of the core foundational, the core question raised by MISO is one of facts about the effectiveness of relief, which, again, is not really tariff language. But it can be relevant to what they call their perspective relief claim or the fourth issue here about Section 1.3.4, the removal provision. And this is ultimately reviewed under a doubly deferential standard. One is under the sort of the policy tradeoffs I mentioned with Permian Area Rate, Permian Basin Area Rate cases, but also under the substantial evidence standard. Now, my friend said there's no dispute that the relief here cannot be effective, but I have to disagree with that. Not only was there a dispute here, there's substantial evidence to support the Commission's finding in Paragraph 75 and in Paragraph 74 of their hearing order that SPP's actions were sufficient to address congestion on this flowgate. If it's okay with my remaining time, I'd like to walk through that quite quickly. To begin with, both RTOs agreed to the pre-board flowgate threshold here of 5%. And as noted in JA 830 to 831 and JA 254, that threshold indicates practical re-dispatch options. In other words, practical options for congestion relief here. And contrary to my friend's assertion that there was no accusation that MISO could have done more here, in fact, Basin Electric made that exact assertion at JA 807 with the claim that MISO could have been dispatching other generation. Which again, that's what the flowgate studies show. And the flowgate studies really indicate sort of the problem with their theory is that there's no arbitrary geographic cutoff here. MISO and SPP are gigantic regional transmission organizations precisely because they are integrated markets. A generator in Arkansas, a gas-powered power plant, can inject energy into the system and that can cause energy to come out in North Dakota. Now, that might be more expensive, it might have more losses, there might be a slower impact there. But you can call on power from Minnesota, anywhere else, MISO or even an SPP as well. And that's why these organizations are so large, because the grid is integrated. I would also note, probably most critically, SPP introduced evidence that the Commission credited that relief has been effective under the most important criteria, which are the system operating limits. Meaning, they are managing congestion on this particular flowgate to the point where it does not overwhelm the actual transmission lines. And that's at J831 and J860. And this evidence indicated that during the warmest months of the year, the warmest half of the year, when the transmission lines have the least amount of capacity to handle thermal charge, it has been 96% effective, market-to-market coordination has been 96% effective in meeting those limits. Now, they may come up here and say, well, it could be 100% effective, or the prices are too high, even during that 96%. We don't like that. But again, under the Federal Power Act's Great Deference Standard, the Commission is entitled to make these sort of policy tradeoffs. And TIRA did so equitably in knowing the extent of the record. As mentioned, on a similar vein, on the price point, similar evidence from SPP at the same JA sites, J831 and J860, mentions that not only was it effective in sort of a physical sense in the transmission lines, but the prices on the Charlie Creek flowgate rarely hit the price caps, what are called the shadow prices. And those are what, in FERC jargon, what the VRLs are, violation relaxation limits. And in that case, the prices only hit the cap, or prices were under the cap over less than 2%, I'm sorry, over 98% of the time. So it was over 98% effective. And that's generally enough to support substantial evidence here. And finally, I think one other point on this is that on the market-to-market, even if market-to-market coordination is not a perfect solution, even if Montana, Dakota, or others thinks that they might be paying too high of a price or they would like the prices to be lower, the alternative here is ultimately worse in terms of social efficiency sense. And that is because the alternative, as recognized in the tariff section in 12.1.1 under MISO's good utility practice claim, is transmission loading relief. If you don't have market mechanisms to deal with this sort of congestion, you have to have a strict and very blunt and very crude command and control system where you tell someone to stop transmitting so that they don't use this flowgate entirely. And that means you might have to unwind entire transactions, keep people off this flowgate, which means you could shut down power transfers on one side of the seam, potentially both. And that was mentioned in Rehearing Order Paragraph 74, the Complaint Order Paragraph 143 as well, as SVP's evidence at J862, 832-33, and 864. And so even if this creates some pain, the alternative can be much worse here. And there's no substantive response either from Topside Counsel on that one or really, I think, in the blue briefs or reply briefs. I certainly don't want to belabor the Court's or to waste the Court's time on anything else, but should I address the good utility practice claim? I don't think Topside Counsel did that, but I'm happy to do so. No other further questions to the Court? I yield the rest of my time. Thank you. Two quick points. First of all, FERC is relying very heavily on the intent and purpose language, and they say the location doesn't matter, that it's placed under something that says qualifying conditions, but they do not cite a single case where language like that is placed under a heading and a structure that involves binding conditions. And so the location does matter, and I think our case, In Re Financial Management of Puerto Rico, speaks to that, where you have pledge language, it's sort of intent language, but the Court says, this is not prefatory language because it's placed under a substantive heading. It is somewhat unusual to have intent language be a binding condition, but it's also very unusual to have intent language be under something called qualifying conditions. And so I think the way that you reconcile that is the parties wanted there to be a final check to ensure whether going forward with market-to-market coordination was consistent with the party's purpose to address regional, not local, issues. And that's because if you don't have that check, you're just banging your heads together trying to coordinate on something that's local, and you have a situation where SPP caused the problem by allowing Atlas to come online. SPP's the only one that could solve the problem when they ultimately built transmission and they built more generation, but MISO gets stuck with the gigantic bill. So turning to the double charging, I want to focus on, you heard the argument about the confusion about the charges. I think this Court can look at that and determine who's correct about that. FERC's principal argument is that SPP says that it used this predictive flow factor process which was designed to generally minimize or eliminate double charging, but it didn't ever look at our evidence that showed that despite their claim that they used this process that generally is supposed to work, we were in fact double charged to the tune of $42 million. A commission does not act rationally when it just turns a blind eye to that evidence, and it doesn't look at whether SPP was actually communicating with MISO to reduce the double charging. Whether this process that was designed to reduce double charging actually resulted in eliminating the double charging. So that's, I think, the focus of the double charging argument, which again is independent of whether the market-to-market coordination was proper. And so I'd love to answer any further questions, but if there are none, then we'll ask that the order be vacated. Very good, counsel.